STATE *vs.* WALTER BRINTE AND JOHN JINER, *alias* JOHN JOINER.

*Severance Refused—Admissibility and Value of Confessions—Accomplice—Murder—Proof of Express and Implied Malice—Reasonable Doubt—Conflict of Testimony—Wrong Person Sworn as Juror—New Trial Refused—Convict under Death Sentence must be Confined in Workhouse but Executed by Sheriff.*

1. A severance refused and joint trial sustained.

2. Where questions are asked the accused by the officer having him in custody. in order to elicit his statement, and his answers are written down, read to and voluntarily signed by him, the fact that the questions were not incorporated in the writing does not render it inadmissible as a confession.

3. If the confession of one prisoner made after the crime has been committe '. implicates another, not then present, by name it must be proved as it was made, n t omitting such name ; but the Court should instruct the jury that it is not evidenc. against any but the one making such confession.

4. Where one person inflicts the mortal wound but another aids and co-operates with him in the felonious assault, the latter is equally criminal and punishable.

5. Murder of the first and of the second degree, manslaughter, and malice defined.

6. How murder with malice express, and with malice implied, respectively, may be proved.

7. Although where the fact of killing is shown by the prosecution, unaccompanied by circumstances of legal justification, excuse or mitigation, the law presumes that the homicide was committed with malice until the contrary be shown ; yet it merely implies malice, and therefore the legal presumption goes no further than that the killing is murder of the second degree under the statute. In such case, before a verdict of murder of the first degree can lawfully be rendered, the prosecution must show by the facts and circumstances attending the homicide that the killing was done with a sedate, deliberate purpose, and formed design to take life.

8. A confession of guilt reduced to writing and signed by the person making it, if deliberately made and signed, without being influenced thereto by any threats or

promises by others, should be regarded, in the absence of testimony to the contrary, as strong and convincing evidence in the case.

9. A confession of guilt should not be received where it is not free and voluntary, but procured through the influence of threats or the promise of favor. The degree of credit due to it is to be estimated by the jury under the circumstances of the particular case. The jury may credit that part which criminates the accused and reject that which is in his favor, or *vice versa*.

10. Instructions as to reasonable doubt and conflict of testimony.

11. When the name of John C. Mitchell was duly and lawfully placed on the jury list for the term, but John W. Mitchell was actually summoned and, on his *voir dire* examination, accepted by the prisoner as a juror and sworn at the time, and it not appearing that any prejudice or injustice was thereby done to the prisoner, a motion for a new trial was in view of these and the other circumstances of the case, refused.

12. Held that, under *Sec. 4, Chap. 247, Vol. 21, Laws of Delaware*, a person convicted of murder and sentenced to death in New Castle County, must be confined in the County Workhouse as the public prison of the County, until the time appointed for his execution, but that such sentence must be observed and executed within said prison inclosure by the sheriff of the County in conformity with the provisions of *Sec. 11, Chap. 32 and of Sec. 30, Chap. 133, Rev. Code*.

(*May 27, 1904.*)

Judges GRUBB, PENNEWILL and BOYCE sitting.

*Herbert H. Ward*, Attorney-General and *Robert H. Richards*, Deputy Attorney-General, for the State.

*Daniel O. Hastings* for defendant Brinte. *Sylvester D. Townsend, Jr.*, for defendant Jiner.

At a Court of Oyer and Terminer, in and for New Castle County, held in May, 1904, the defendants, two colored men, were put upon trial for murder in the first degree, for the felonious killing of one John R. Taylor, a colored man, in Wigglesworth's livery stable, on Tenth street, near Orange, in the city of Wilmington, on the night of Sunday, January 3, 1904. The further facts appear in the confessions of the prisoners.

Before the jury was empanelled, Mr. Hastings, counsel for the defendant Brinte, moved that a severance be granted, and that

Brinte be put upon trial alone, basing said motion upon the affidavit of Brinte, which set forth that "he is one of the defendants in the above stated cause; that he is jointly indicted with one John Jiner, and that he cannot go to trial with the said John Jiner for the following reasons, viz.: That by a separate trial he would be entitled to twenty peremptory challenges of jurors; that it is not expedient or safe for him to join with John Jiner aforesaid in his peremptory challenges, or in the defense which the said John Jiner will make upon the trial of said indictment; that your deponent is informed and believes that there is a general prejudice and bias of mind among the inhabitants of New Castle county against the said John Jiner, and that such prejudice would operate against a fair trial for your deponent if he should be tried with him; that this deponent fully expects and believes that evidence will be offered by the State alleging that the said John Jiner made certain statements confessing his complicity in the crime committed, and in which statements he accuses your deponent of being the principal; that on a joint trial he is informed that these statements would be admitted against the said John Jiner, and your deponent says that, if they should be admitted against the said John Jiner, they could not help but work injustice to him, if he is tried with the said John Jiner; that they could not be admitted against him if tried separately. Your deponent therefore prays that a severance be granted, and that he be put upon trial alone."

*Mr. Hastings* cited in support of his motion for severance *Clark on Criminal Procedure ; Commonwealth vs. James, 99 Mass., 438 ; Hughes Criminal Law and Procedure, 743.*

The Attorney-General, in opposing the motion for severance, cited *Commonwealth vs. Place, 153 Pa., 314, 318 ; Commonwealth vs. Bingham, 158 Mass., 169 (33 N. E. 341) ; Commonwealth vs. Miller, 150 Mass., (69 22 N. E. 434) ; Ball vs. U. S., 163 U. S., 662, 672, (16 Sup. Ct., 1192 ; 41 L. Ed., 300) ; Regina vs. Blackburn, 6 Cox Crown Cases, 333.*

After hearing argument and citation of authorities, the Court refused to grant the severance prayed for.

GRUBB, J.:—The Court are unanimously of the opinion that the grounds urged in this application are not sufficient for the Court to grant a severance. We believe that we are supported in this by the weight of authority. We would suggest to the counsel, however, that, when the confession is offered in evidence, they can object to its admissibility, and raise the question, and we will pass upon it at that time, as to what effect that confession shall have upon the jury, and you can ask us to charge the jury that the confession of one prisoner cannot be evidence against the other. We will then act upon your prayer as to instructions to the jury according as we deem the law to be.

Evidence was offered tending to prove that the statement was made by the defendant Jiner to the Chief of Police in the presence of his clerk and others, which statement was reduced to writing, smoothed up a little, copied on a typewriter, and then read to Jiner and signed by him, and that said statement was freely and voluntarily made by Jiner, without any inducements in the way of threats or offers of reward on the part of the police officers or others, but that the statement was elicited by questions asked Jiner, which questions were not embodied in the statement, but that said statement contained all that was considered of any consequence. The Attorney-General then offered the above statement in evidence as the confession of Jiner. The same was objected to by Sylvester D. Townsend, Jr., Jiner's counsel, on two grounds : *First.* That any statement made by a prisoner in the custody of a police officer, detective, or other authorities, is not a free and voluntary confession, under the provisions of the fifth amendment of the Constitution of the United States, and the police have no right to question or cross-examine any prisoner arrested or charged with a crime. *Bram vs. U. S., 168 U. S., 532,—18 Sup. Ct. 183, 42 L. Ed. 568 ; Regina vs. Hirsted, 19 Cox Crown Cases, 16.*

*Second.* That according to the testimony the questions asked

Jiner were not incorporated in the alleged confession, and as it was, therefore, not a complete confession, it was inadmissible, because the defendant was entitled to have all that he said set forth, and not merely a part of it.

*2 Greenleaf on Evidence, Sec. 18 ; Hughes Criminal Law, Sec. 137.*

GRUBB, J.:—The police who were present say that they put down all that they considered of consequence, and, we must presume, all that Jiner considered of consequence. Because questions are asked in order to elicit a statement, and are not written down, but only the answers to them, does not invalidate the admission of the statement as evidence, for we have uniformly accepted statements given in a narrative form, without the questions which drew out the statement appearing in the confession. So that, according to our uniform practice, these statements have been admitted in this form without the questions being set out. As he has signed it after it was read over to him, it is presumably what he wanted to say and wanted to confess, and there is no evidence that there was anything said by him that he wanted put in the paper, other than what appears there. We overrule the objection, and hold that the written confession of Jiner is admissible.

*Mr. Hastings :*—In this statement of Jiner there are certain references to the defendant Brinte which I desire to have the Court strike out of the confession, on the ground that it was not made in the presence of Brinte ; that in the place of Brinte's name the language "one other" be used.

GRUBB. J.:—The whole confession is in evidence. We refuse to strike out the name of Brinte therefrom, upon the authority of *State vs. Jones, et. al., Houst. Cr., Cas., 320.*

The Attorney-General offered similar proof as to the type-written confession of Brinte, which was admitted in evidence,

against the objection of his counsel, on the same ground as was the admission of the confession of Jiner.

*Mr. Townsend :*—I ask that all that applies to Jiner in Brinte's confession be either stricken out, or put in such condition that it will be unknown to the jury, on the ground that it was not made in the presence of Jiner.

GRUBB, J.:—We refuse your application. It is admissible, subject to your prayers for instructions to the jury.

The Court, through GRUBB, J., at this point instructed the jury that any reference made in the confession of either of the prisoners implicating the other prisoner was not to be considered by them as evidence in the case against such other prisoner, but that the confession of each prisoner was to be taken only as against the one who made it. The Attorney-General thereupon read the confession of the prisoner Brinte, and also of the prisoner Jiner, to the jury, which confessions were as follows :

STATEMENT OF WALTER BRINTE. On Sunday, January 2d, about 10.30 A. M., John Jiner came to my house over Eleventh street bridge, and asked me to go out with him. We went out and took a walk together. He asked me to come up to George Wigglesworth's stable to see him that night. He then left me and came uptown. About 10 o'clock Sunday night I went to the stable to see him, and he told me that I was too early. I left him and went back some time after the cars had stopped running, He then said to me, ' Let's go back here in the house to see some one ;' but, instead of going into a house, he took me outside in a small street back of the stable, and asked me if I had nerve enough to hit Taylor. I told him that I didn't, and he said : 'You can hold your ears, and I'll hit him. I don't give a damn.' We then went into the stable, and went into the office, and waited there until Taylor went asleep. We then went out and pulled down the elevator, and Joiner cut the weight off. We went into the office again, and he

made several cigarettes and smoked them.    After a little while he said to me, 'If you can't hit him, go outside and hold your ears and turn out the lights.'    I went out and turned out the lights, and Joiner hit him.    He then called me in and turned on the light, and Taylor was lying there and was groaning.    Joiner pulled off his pants and searched them.    Then Taylor turned a little and groaned, and Joiner took the weight and hit him in the head again. He then found his money in the inside pocket of his coat.    There was $25.    After he got the money he took the weight and hit him again.    Joiner then got Taylor's overcoat and put it on, and got all of his clothes, and we went out the back way of the stable, and along Tatnall street to Eleventh street.    We went down Eleventh street to John Welsh's saloon.    In the saloon Joiner treated several times, and bought a quart of whiskey, and got several cigars.    We then went to John Dougherty's, and went to bed.    We got up about 5 o'clock Monday morning and went on the street cars as far as Shellpot Park.    It was very cold, and we came back into the city again as far as Tenth and Market.    We waited there for some time, and then we took a Darby car and went to Philadelphia. While in Philadelphia, Pa., Joiner paid all my expenses, and gave me three dollars to pay my lodging.    He again gave me five dollars.    While there he gave me a watch to keep for him.    He afterwards took it from me again,    We stayed all night in a lodging house on Sixth street, and the following morning (Wednesday) I came home, since which time I have not seen Joiner.    I make this statement voluntarily, and without promise or reward of any kind.

WALTER BRINTE.

Witnesses : GEORGE BLACK, Chief of Police.
          CHARLES E. EVANS, Capt. of Police.
          WILLIAM F. SCHELL.

STATEMENT OF JOHN JINER.    On Sunday night, January 3, 1904, Walter Brinte came to Wigglesworth's stable to see me.    He had previously been to the stable, and we had seen Taylor with

$200, and he had told us that he had put it all in bank but $26.04. He had two pocketbooks. In the large book he had two ten-dollar and one five dollar bill, and in the small one he had a paper dollar and four cents. Brinte suggested that we take the money from him, and I agreed to it. Early Sunday evening Brinte came to the stable, and stayed around awhile. He then went away, and came back towards midnight. We then had a talk, and Brinte got a knife, and we went to the elevator, and while I held the elevator ropes Brinte cut the weight off. I then tied the ropes up with a piece of rope I took with me. Brinte then took the weight and wrapped a piece of blanket about it. Taylor was sitting in a chair, with his head in his hands, and Brinte approached him and struck him with the weight. Taylor then commenced to moan and make considerable noise, and Brinte said to me, "Don't let him holler." I then took the weight and struck him the second blow. Brinte, then searched him, and took the large pocketbook, with the twenty-five dollars in it, and I took the small one, with the one dollar and four cents in it. We then turned out the light in the stable and started out. When Brinte noticed the watch on Dr. Miller's buggy he took it, and I took Taylor's overcoat and two shirts. We went along Eleventh street to Welsh's saloon. We went into the saloon and I bought a pint of whisky for 50 cents. I took the $5 bill from the big pocketbook and paid for the whisky, in order to break the money so we could divide it. After we came out of the saloon we divided the money. Each of us got $12.77. From there we went over Eleventh street bridge and stayed all night at John Doughtery's house. Brinte paid him $1 for the lodging. The next morning we got on a Vandever avenue car and rode to Market street, where we got on a Darby car and went to Philadelphia. We stayed all day and night on Ludlow street, with a woman named Hannah Madden. On Tuesday we took the watch to a shop to have it fixed, and stayed all night Tuesday in a lodging house at Sixth and Lombard street. On Wednesday Brinte left me in Broad Street Station, and I went back to Ludlow street. I

pawned the overcoat, and gave the ticket to the Madden woman to keep for me.    I left there about 3 o'clock Thursday afternoon, and then started to Harrisburg, where I was arrested.    I make this statement voluntarily, and without promise or reward of any kind.

JOHN JINER.

Witnesses : GEORGE BLACK,
WM. F. SCHELL.

The State produced numerous witnesses whose testimony corroborated the statements contained in the above confessions in almost every detail, and produced and offered in evidence the heavy iron elevator weight referred to, the piece of rope with which it was tied, the overcoat of the dead man Taylor, which was pawned in Philadelphia by Jiner, and the shirts owned by Taylor.    The clock taken from the carriage of Dr. Miller at Wigglesworth's stable on the night of the murder was recovered from a pawnshop in Philadelphia, where it had been pawned by Brinte, and was subsequently returned to the owner.    After proving the above facts the State rested.    The defendants produced no evidence.

GRUBB, J., charging the jury :

Gentlemen of the jury :—In this indictment Walter Brinte and John Jiner, *alias* John Joiner, the prisoners at the bar, stand charged with murder of the first degree, for the felonious killing, with express malice aforethought, of John R. Taylor, in the month of January of the present year, at Wilmington hundred, in this county.    The first count of the indictment charges that the death of the said Taylor was caused by mortal wounds inflicted by Walter Brinte by the means and in the manner described therein, whilst the said John Jiner was aiding and abetting the said Brinte as his accomplice in committing said felonious assault ; the second count charges that the death of Taylor was caused by mortal wounds inflicted by said Jiner whilst Brinte was aiding and abetting Jiner as his accomplice in the crime ; and the third and last count of the

indictment charges that the death of Taylor was caused by mortal wounds inflicted by each and both of said prisoners.

A statute of this state provides that "every person who shall abet, procure, command or counsel any other person or persons, to commit any crime, or misdemeanor, shall be deemed an accomplice and equally criminal as the principal offender, and shall be punished in the same manner and with the same punishment." (*Rev. Code, 1852, Chap. 133, Sec. 1*). Therefore, if the jury is satisfied that either of the prisoners inflicted said mortal wounds, it is sufficient for the conviction of the other, who was, if you so find from the evidence, aiding and assisting in the felonious assault upon Taylor the one who actually inflicted them, because, in contemplation of law, it becomes the act of each and all of those who were co-operating and participating in the perpetration of the crime then and there committed.

Under any indictment for murder of the first degree, the jury may find the accused guilty of either murder of the first or second degree, or of manslaughter, according as the law and the evidence may warrant; but, unless they shall find the accused guilty of one of these three grades of homicide, they must acquit, and render a general verdict of not guilty.

Homicide is the killing of any human creature, and is of three kinds—justifiable, excusable, and felonious.

Felonious homicide, at common law, is of two kinds, namely, murder and manslaughter, the difference between which consists principally in this : that in murder there is the ingredient of malice, whilst in manslaughter there is none, for manslaughter, when voluntary, arises from the sudden heat of the passions, but murder from the wickedness and malignity of the heart. Therefore manslaughter is defined to be the unlawful killing of another without malice, either express or implied, and without premeditation.

Murder is where a person of sound memory and discretion unlawfully kills any human being under the peace of the State, with malice aforethought, either express or implied. The chief

characteristic of this crime, distinguishing it from manslaughter and every other kind of homicide, and therefore indispensably necessary to be proved, is malice preconceived or aforethought. This term, malice, is not restricted to spite or malevolence toward the deceased in particular, but, in its legal sense, it is understood to mean that general malignity and recklessness of the lives and personal safety of others which proceed from a heart void of a just sense of social duty and fatally bent on mischief. Malice is implied by law from every deliberate, cruel act committed by one person against another, no matter how sudden such act may be. For the law considers that he who does a cruel act voluntarily does it maliciously.

Under the statute laws of this State (*Rev. Code, 1852, Chap. 127, Sec's 1-2*), there are two degrees of murder, namely, murder of the first and murder of the second degree. The first is where the crime of murder is committed with express malice aforethought, or in perpetrating or attempting to perpetrate any crime punishable with death; and the second degree is where the crime of murder is committed otherwise, and with malice aforethought implied by law. Express malice is proved by evidence of a sedate, deliberate purpose and formed design to kill another; and such purpose and design may be shown from the circumstances attending the act, such as the deliberate selection and use of a deadly weapon, knowing it to be such, stealthily lying in wait, preconcerted plans, or the previous procurement or preparation of instruments, contrivances, or other means for slaying or doing great bodily harm to the deceased victim. These, however, are but some of the instances, given for the sake of examples or illustrations, in which the external or attending circumstances will evidence the sedate, deliberate mind and formed design to kill, or to do the party killed some bodily harm, for whenever in any other instance the attending circumstances evidence such a mind and design to do the act, and death ensues, it constitutes, in law, express malice aforethought, and murder of the first degree, under the statute, and is punishable with

death, as where one, either from motives of hatred or revenge, or with a view to rob him of his money or get possession of any other thing about his person, cooly and deliberately forms the design in his mind to kill another, or wound and disable him for that purpose, and commits the act, either by lying in wait for him, or in any other manner, and his death ensues as the consequence of such bodily injury, it is likewise murder with express malice aforethought, and of the first degree, under the statute.

*State vs. Goldsborough, Houst. Cr. Cas., 314.*

Implied or constructive malice is an inference or conclusion of law from the facts found by the jury ; and, among these, the actual intention of the prisoner becomes an important and material fact for, though he may not have intended to take away life or to do any personal harm, yet he may have been engaged in the perpetration of some other felonious or unlawful act from which the law raises the presumption of malice.   It is the difference between express and implied or constructive malice aforethought which distinguishes murder of · the first from murder of the second degree, except, however, that under our statute murder of the first degree may be committed when the malicious killing is done in perpetrating or attempting to perpetrate any crime punishable with death, as rape or arson is in this State, although from such a felonious act malice is merely implied or presumed by law.   Therefore murder of the second degree is held to be proved where it is not satisfactorily shown by the evidence submitted to the jury that the killing was done with a deliberately formed design to take life, or in perpetrating or attempting to perpetrate any crime punishable with death, but is so shown that it was done suddenly, without justification or excuse, and without any provocation, or without provocation sufficient to reduce the homicide to the grade of manslaughter, or was done in perpetrating or attempting to perpetrate a felony not capitally punishable, or any unlawful act of violence from which the law raises the presumption of malice.

Having thus instructed you as to murder of the first and second degrees and the lesser grades of homicide, for your proper guidance in determining the guilt or innocence of the prisoners whom you have in charge, it is also proper to remind you that, as the law presumes every accused person to be innocent until he is proven guilty, the burden is upon the prosecution to prove beyond a reasonable doubt, by competent evidence, every essential ingredient of the crime charged in this indictment, before the prisoners, or either of them, can be found guilty thereof. But on the other hand, every sane man is presumed to intend that which is the ordinary and natural consequence of his own wilful act. Therefore, on the charge of murder, where the fact of killing as charged in the indictment is shown by the prosecution, unaccompanied by circumstances of legal justification, excuse or mitigation, the law presumes that the homicide was committed with malice, and hence amounts to murder, until the contrary is shown ; and consequently the burden is thereupon thrown upon the accused of disproving the malice and showing by evidence to the satisfaction of the jury that the killing was not malicious, but was either justifiable or excusable homicide, or else manslaughter.

But as it has not been claimed in behalf of the accused prisoners that the alleged killing of Taylor is either justifiable or excusable homicide or manslaughter, it becomes your duty to determine, upon a careful review and consideration of all the evidence before you, whether the said slaying of Taylor is a higher grade of homicide, and, further, whether or not the prisoners, or either of them, are guilty of either murder of the first degree or of murder of the second degree, under this indictment. In considering the evidence with a view to determining this question, you must be guided by the legal definition and nature of these two degrees of murder, and bear in mind the distinction between malice aforethought express and malice aforethought implied, as these have just been defined to you. And here it is necessary also to inform you that although where the fact of killing, as charged in the indictment, is shown by

the prosecution, unaccompanied by circumstances of legal justification, excuse or extenuation, the law presumes that the homicide was committed with malice, until the contrary appears from the evidence produced at the trial, yet it goes no further than to imply malice, and therefore the legal presumption goes no further in such a case than that the killing is murder of the second degree, under our statute. Wherefore, before a verdict by the jury of murder of the first degree can be lawfully rendered, it must be shown by the prosecution that the prisoners, or one of them, killed or participated in the killing of Taylor, if he be dead, with a sedate, deliberate purpose and formed design to take life. Such deliberate purpose and formed design may exist only for the briefest period of time, but it must be shown by the facts and circumstances attending the homicide to actually exist, in order to prove that express malice aforethought, without the evidence of which a conviction of murder of the first degree cannot be secured.

But before the prisoners, or either of them, can be found guilty of murder of either degree under this indictment, it is imperatively incumbent on the prosecution to prove to you, beyond a reasonable doubt, *first*, that John R. Taylor died on or about January 8th of the present year; *second*, that his death was caused by the means, and in the manner described in this indictment, and within this county; and, third, that the prisoners at the bar, or one of them, committed, or aided and participated in the commission of, the fatal act, as alleged therein. In the absence of direct or positive evidence, each of these essential ingredients of the crime may be established by circumstantial evidence alone.

Regarding confessions of guilt in criminal prosecutions, you will remember that these are either direct confessions, or confessions inferred from the conduct, etc., of the accused, and termed indirect confessions of guilt. Confessions of guilt should not be received where they are not free and voluntary, but procured through the influence of threats or the promise of favor. Both their admissibility and value as evidence depend upon their being

deliberate and voluntary, and on the presumption that a rational being will not make admissions prejudicial to his interests and safety unless impelled to do so by the promptings of truth and conscience. A confession of guilt reduced to writing, and signed by the person making it, if deliberately made and signed, without being influenced thereto by any threats or promises by others, should be regarded, in the absence of evidence to the contrary, as strong and convincing evidence in the case. The degree of credit due to a confession is to be estimated by the jury under the circumstances of the particular case. The whole of what the accused said on the subject at the time of making the confession should be taken together. The jury may believe that part which criminates the accused and reject that which is in his favor, or credit so much as is in his favor and discard that which is against him, if they see sufficient grounds, upon all the evidence, for so doing, for the jury are at liberty to judge of it, like any other evidence, from all the proven circumstances of the case.

After the commission of a crime has been accomplished, no one engaged in it can, by any subsequent declaration or act of his own, not made or done in the presence of another, affect that other person. His confession, therefore, subsequently made, is not admissible in evidence as such against any but himself. If the confession of one prisoner implicates any other person by name, it must be proved as it was made, not omitting such name; but the Court should instruct the jury, as we do you, that it is not evidence against any but the prisoner who made such confession.

*1 Greenleaf on Evidence, Secs. 218, 223.*

Proof beyond a reasonable doubt does not mean that the guilt of the accused or any other fact shall be established with the absolute certainty of a mathematical demonstration. Matters of fact are required to be proved merely to a moral certainty. To require more in dealing with human conduct and the ordinary affairs of life would be impracticable and therefore unreasonable. It is sufficient that any disputed fact relating to these shall be

established by that amount of competent or appropriate evidence which ordinarily satisfies an unprejudiced mind beyond a reasonable doubt. The circumstances which will amount to this degree of proof can never be previously defined. The only legal test of which they are susceptible is their sufficiency to satisfy the mind and conscience of a man of common sense and ordinary discretion, and so to convince him that he would act upon that conviction in matters of the highest concern and importance to his own interest. Reasonable doubt, in the legal sense, therefore, does not mean a vague, speculative, or whimsical doubt or uncertainty, nor a merely possible doubt of the truth of the fact to be proved.

In civil cases it is the duty of the jury to decide in favor of the party on whose side the weight of evidence preponderates, and according to the apparent probability of truth ; but in criminal cases, because of the graver consequences of a wrong decision, the jurors are required to be satisfied beyond a reasonable doubt of the guilt of the accused, or it is their duty to acquit him. In civil cases it is sufficient if the evidence in the aggregate agrees with and supports the hypothesis which it is adduced to prove, but in criminal cases it must not only do this, but also must be such as to produce a moral certainty of guilt, and to exclude any other reasonable hypothesis or conclusion but that of the guilt of the accused. In both cases a verdict may well be founded on circumstances alone, and these often lead to a conclusion more satisfactory than that produced by direct evidence. In considering the testimony, if you find that any of the witnesses contradict each other, you must decide between them after viewing the testimony of each in connection with all the facts and circumstances proved in the case, and after considering the comparative qualifications and advantages of each for knowing, observing, comprehending, recollecting, and impartially and truthfully relating the circumstances and matters concerning which they have testified. Where there is a conflict of testimony, you must reconcile it, if possible. If you cannot do so, then you may reject so much thereof as you deem the less trust-

worthy, and accept that portion which you consider the more so, after due deliberation upon all the evidence submitted from the witness stand, and from no other source.

You are the judges of the facts and of the credit due to the respective witnesses, and it is your exclusive province, subject only to the law as explained to you by this Court, to determine according to the evidence whether or not the prisoners, or either of them, have been proven, beyond a reasonable doubt, guilty of any offense under this indictment. By reasonable doubt, as we have already explained, is not meant a vague, speculative, whimsical, or merely possible doubt, but such a doubt only as intelligent, reasonable, and impartial men may honestly entertain after a careful examination and conscientious consideration of all the evidence.

It only remains for us to say in conclusion that if, after such examination and consideration of all the evidence submitted on both sides in this case, you shall be satisfied, beyond such a reasonable doubt, that the prisoners, or either of them, are the persons who, as principals or accomplices, caused the death of Taylor as alleged in this indictment, and within this county, then you are further to determine, subject to the law as we have explained it to you, whether or not the prisoners, or either of them, are guilty of murder of the first degree, or murder of the second degree, or of any kind of felonious homicide, and render your verdict accordingly. But if, after such examination and consideration of said evidence, you should not be so satisfied that the prisoners are guilty of murder of either degree, or of any kind of felonious homicide, then you should acquit them, and render a verdict of not guilty. Any one or both of the prisoners may be convicted or acquitted under this indictment, according as the evidence may justify and warrant it, in the judgment of the jury.

With these instructions for your aid and guidance in the discharge of your solemn and responsible duty, the case is now submitted to you for your verdict.

Verdict.—John Jiner, guilty of murder of the first degree; Walter Brinte, guilty of murder of the second degree.

MOTIONS FOR NEW TRIAL, ETC.

*Mr. Townsend,* counsel for the defendant Jiner, thereupon made motions for a new trial and in arrest of judgment, basing said motions upon the following reasons for a new trial:

"John Joiner, one of the above-named defendants, by Sylvester D. Townsend, Jr., his attorney, files the following reasons for a new trial: (1) That the panel of jurors drawn for service at the Court of Oyer and Terminer in and for New Castle County, in the State of Delaware, at the May term, A. D. 1904, included, among others, a certain John C. Mitchell. (2) That the said John C. Mitchell did not appear at the said court, but that a certain John W. Mitchell appeared and answered for the said John C. Mitchell. (3) That the said John C. Mitchell's name, was drawn by the proper officer of the court as one of the jury in this cause. (4) That he, the said John W. Mitchell, in response to such call for John C. Mitchell, took his place as one of the jurors in this cause, although he was not the John C. Mitchell intended as a juror in this cause. (5) And that therefore there was a mistrial in this cause. That the aforesaid facts were unknown to the said John Joiner, or his counsel, until after the jury had been sworn and the trial begun. Therefore the said John Joiner, by Sylvester D. Townsend, Jr., his attorney, prays the Court that the verdict in this cause be set aside, and that a new trial be granted."

The following affidavit was filed in support of the above reasons:

"STATE OF DELAWARE, NEW CASTLE COUNTY, ss.: Personally appeared before me, Sylvester D. Townsend, Jr., a notary public for the State of Delaware, Caleb C. Hopkins, who, being by me duly sworn according to law, deposes and says that he is Levy Court Commissioner for the Fourth District of New Castle County; that on or about the 18th day of March, A. D. 1904, in accordance with the statute in that behalf made and provided, he deposited in

the petit jury box of New Castle county the name of one John C. Mitchell; that at the May term, A. D. 1904, of the Court of Oyer and Terminer, in the case of the State against Walter Brinte and John Joiner, when the name of John C. Mitchell was called, one John W. Mitchell made answer, and was duly sworn and served on said jury; that the person or juror who answered to the name of John C. Mitchell was not the John C. Mitchell intended and designated to serve on said jury; that your said deponent saw the said John W. Mitchell on his attendance at the said Court of Oyer and Terminer as a juror; and that he was not the same person whose name your said deponent, as such Levy Court Commissioner, had deposited, or whose name he had intended to deposit, in the jury box as aforesaid. Further, your deponent saith not.

CALEB C. HOPKINS.

"Sworn and subscribed before me this 31st day of May, A. D. 1904.

SYLVESTER D. TOWNSEND, JR.,

[Seal of Notary]                                   *Notary Public.*"

The State filed counter affidavits, which, omitting the captions, were as follows:

"STATE OF DELAWARE, NEW CASTLE COUNTY, ss.: Be it remembered that on this 2d day of June, A. D. 1904, personally came before me, George Janvier, Deputy Clerk of the Peace, George W. Cox, who, being by me first duly qualified according to law, deposes and says that he is a deputy of the Sheriff of the County of New Castle, in the State of Delaware; that, as the deputy of said Sheriff, there was put in his hands a part of the certified list of special jurors to be summoned to attend the Court of Oyer and Terminer at the term thereof which began on the 25th day of May, A. D. 1904, in and for the said County of New Castle; that among other names so put in his hands as aforesaid was the name John C. Mitchell; that this deponent knew of one John Mitchell, a resident in Stanton, in the said County of New Castle, and duly summoned

him to attend said court as a member of said special jury so to be summoned as aforesaid; that upon summoning the said Mitchell he found that the middle initial of said Mitchell was "W", rather than "C", but this deponent assumed that there had been a clerical error as to the middle initial of said Mitchell, and that the said John W. Mitchell was the man intended to be described by the name of John C. Mitchell upon the list of said jurors so placed in his hands to summon as aforesaid; that this deponent duly and regularly summoned the said John W. Mitchell to attend said Court of Oyer and Terminer as a member of said special jury for said term, and did not summon any other John Mitchell for said purpose; that the said John W. Mitchell duly attended said court as such such special juror, and sat on the above stated cause as a juror to try the defendants in said cause.

GEORGE W. COX.

"Sworn and subscribed before me this 2d day of June, A. D. 1904.

GEORGE JANVIER,
*Deputy, C. P.*"

"STATE OF DELAWARE, NEW CASTLE COUNTY, SS.: Be it remembered that on this 2d day June, A. D. 1904, personally came before me, George Janvier, Deputy Clerk of the Peace, Winfield S. Quigley, who, being by me first duly qualified according to law deposes and says that he is the Clerk of the Peace in and for said County of New Castle, and, as such, took out of the box containing the names of the general and special jurors in attendance at the trial of the above named defendants the names of the jurors as they were called to be sworn upon their *voir dire* at the time of the impaneling of the jury in the above stated case; that upon one of the slips containing the names of said special jurors was the name John C. Mitchell; that said deponent called out said name in a loud tone of voice; that thereupon a certain John W. Mitchell, being the only John Mitchell who had been summoned either upon said general or special jury lists in attendance at said term, arose and responded to

said name of John C. Mitchell; that thereupon it was suggested that the name of said Mitchell so arising and responding as aforesaid was John W. Mitchell, and not John C. Mitchell, and that this deponent thereupon asked the said Mitchell, in the presence and hearing of said defendants and their counsel, whether his name was John C. Mitchell, or John W. Mitchell; that said juror replied, in a tone of voice audible to this deponent and all other persons there being, that his name was John W. Mitchell; that thereupon this deponent called the attention of the judges then and there presiding at the trial of the said defendants to the fact that the name of the said juror was John W. Mitchell, and not John C. Mitchell; that thereupon, no objection being made by either the Attorney-General or by the counsel for said defendants, the said John W. Mitchell was first duly sworn upon his *voir dire* by the name of John W. Mitchell, and, under oath, replied to the questions usually asked a proposed juror upon his *voir dire* in a capital cause; that thereupon the said prisoners were given an opportunity to challenge the said juror, either peremptorily or for cause, by said prisoners, but responded to the said opportunity to so challenge said juror with the words 'Swear him,' pronounced by said prisoners through the mouth of their counsel then and there engaged in defending them on said trial; that said juror was also accepted without challenge by the State, the plaintiff in said cause; that thereupon the said juror was duly sworn to try said cause by the name of John W. Mitchell, and regularly sat in said trial during the entire course thereof, without objection upon the part of the said prisoners or their counsel, and was one of the jurors which returned a verdict of guilty upon being duly polled at the request of the said prisoners through their counsel; that said John W. Mitchell is a resident and citizen of said State and county, and eligible for jury service under the laws of the State of Delaware; that no person by the name of John C. Mitchell had been summoned or was in attendance on the said court as a juror.

WINFIELD S. QUIGLEY."

"Sworn and subscribed b-fore me this 2d day of June, A. D. 1904.

GEORGE JANVIER,
*Deputy C. P.*"

### ARGUMENT OF MOTION FOR NEW TRIAL.

*Mr. Townsend :*—Where a person who is not the person intended to be summoned is returned, or answers, and participates in the trial, the verdict is of no validity, and the proceedings will be treated as a mistrial.

*12 Am. & Eng. Ency. Pl. & Pr., 352.*

The foregoing is supported, among others, by the following authorities :

*Dovey vs. Hobson, 6 Taunt., 460; Rex vs. Tremaine, 16 E. C. L., 318 ; McGill vs. State, 34 Ohio St., 228 ; People vs. Ransom, 7 Wend., 417 ; Goodwin vs. State, 102 Ala., 87 ; Mingia vs. People, 54 Ill., 274.*

In the case of *Dovey vs. Hobson, supra,* GIBBS, C. J., said : " We think that the eleven jurymen being well summoned, and a twelfth not being well summoned, and a verdict taken by those twelve, and the objection being pointed out at the time, the court, in the exercise of their discretion, ought to set aside this verdict." In *McGill vs. State, supra,* the facts were as follows : Eli Stephenson, whose name appeared in the venire, was regularly summoned and returned by the sheriff. At the trial, when his name was called, his father, of the same name, answered and sat at the trial. BOYNTON, J., said : "* * * A majority of the court are unwilling to hold, especially in a case involving life, that the accused, by neglecting to inquire of the juror whether he was the person by that name summoned, was so far guilty of negligence as to estop or prevent him from taking advantage of the juror's disqualification

after the trial.   *   *   *   The plaintiff was apprised that one Eli Stephenson was one of the regular jurors summoned for his trial; and, when such juror was called, a person by that name appearing and answering thereto, we think he might well assume such person to be the regular juror.   If the person so appearing had borne another name, and had personated the absent juror, this clearly would have been ground for a new trial, if the fact of such personation was unknown to the accused in time to correct the error before he was prejudiced thereby.   *   *   *   Yet no one can doubt that the identity of the two names was calculated to disarm vigilance, and render deception more successful and complete.   Therefore, to impute a want of diligence, under the circumstances, to the accused or his counsel, in not ascertaining before the trial that the sitting juror was not the one summoned, or to hold him to have waived all objection to the juror's competency, would be to exact a higher degree of care aad caution than the law requires."

*12 Am. & Eng. Ency. Pl. & Pr., 364,*—note, *citing Goodwin vs. State, 102 Ala., 89; (15 South., 571,)* says: "The detendant is entitled to the juror drawn by the commissioners, and cannot be required to have one of the same name, whose name was erroneously placed on the venire, and who responded to the name of the juror drawn."

*Mingia vs. People, supra,* says: "Only the persons named on the sheriff's return can be sworn as jurors, and hence it is a ground of error that a juror of a different name from the one furnished the prisoner was sworn upon the panel."

The Attorney-General in opposing the motion for a new trial, cited the following authorities:

*Hill vs. Yertes, 12 East. 29, (1810); Mann vs. Town of Fairlee 44 Vt.\* 672.*

## OPINION.

GRUBB, J. :—It appearing to the Court by the facts before us

in this case that, although John C. Mitchell was the person selected by the Levy Court, and drawn by the Clerk of the Peace and Prothonotary, and whose name was placed on the jury list for this term of court, yet John W. Mitchell was the person actually summoned by the Sheriff, and that the name of John C. Mitchell was drawn from the box by the Clerk of the Court during the drawing of the jury at the trial, and that John W. Mitchell answered thereto, instead of John C. Mitchell, and that thereupon attention was publicly called by the Clerk of the Peace to the fact, in the presence of the prisoner and his counsel, and that, upon the *voir dire* examination of said John W. Mitchell, he was not challenged for this or any other cause by the prisoner or his counsel, but, on the contrary, was expressly accepted by them and sworn as a juror in the cause, and, further, it not appearing to the Court that any prejudice or injustice was done to the prisoner by reason of the fact that John W. Mitchell was sworn and served as a juror at the trial, the motion for a new trial is refused.

### SENTENCE.

The prisoner was thereupon sentenced as follows :

GRUBB, J.:—John Jiner, stand up. John Jiner, you have been indicted by the grand jury of this county for the murder of the first degree of John R. Taylor, and upon that indictment you have had a fair and impartial trial. Your counsel, with great zeal and fidelity, presented to the Court and jury every fact and argument which, in his judgment, were available for your defense. The jury nevertheless rendered a verdict of guilty, and it therefore becomes the solemn duty of this Court to pronounce the sentence of the law upon you for the commission of the heinous crime for which you were indicted. Have you anything to say why this Court shall not now pronounce the sentence of the law upon you ?

*Prisoner :*—Yes, sir ; I have a word to say. I don't think it

is right, when we both were guilty, and both were sent to jail for the same crime, to let one go free, and hang the other. I don't think I have had justice.

GRUBB, J.:—Is that all you have to say?

*Prisoner:*—Yes, sir.

GRUBB, J.:—The sentence of the law, as considered by the Court, is that you, John Jiner, *alias* John Joiner, be now taken from the bar of this Court to the New Castle County Workhouse, the public prison of this county, the place from which you came, and be there safely and securely kept in custody until Friday, the second day of September, in the year of our Lord 1904, and on that day, between the hours of 10 o'clock in the morning and 3 o'clock in the afternoon, be taken to some convenient place of private execution within the precincts of the said prison inclosure, and that you be then and there hanged by the neck until you be dead ; and may God have mercy on your soul.

You are now committed to the custody of the Board of Trustees of the New Castle County Workhouse, until this sentence is carried into execution.

It is also considered, adjudged, and ordered by the Court that a duly certified copy of the foregoing sentence of death upon John Jiner, *alias* John Joiner, be forthwith made and delivered by the Clerk of the Court to Emmit F. Stidham, the Sheriff of New Castle County, as his sufficient warrant to observe and execute said sentence of death according to the judgment of this Court of Oyer and Terminer at the time appointed by the Court.