JAMES ELBERT WILSON, Appellant, v. THE STATE OF DELAWARE, Appellee.

(*November* 23, 1954.)

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, J. J., sitting.

*Louis L. Redding* for appellant.

*Stephen E. Hamilton, Jr.,* Deputy Attorney-General, (*H. Albert Young,* Attorney-General, and *Edmund N. Carpenter, II,* Deputy Attorney-General, on the brief), for the State.

Supreme Court of the State of Delaware, No. 12, 1954.

SOUTHERLAND, C. J.:

Wilson, the defendant below, was tried, convicted and sentenced to death for the rape of Helen Baker, a girl nineteen years of age. His appeal assigns error (1) in receiving in evidence statements made by him to police officers, and (2) in the charge to the jury.

The evidence adduced by the State relating to the commission of the crime was uncontradicted by any testimony on defendant's behalf. A summary follows:

Helen Baker lived with her father and younger sister in an apartment at 429 East 4th Street in the City of Wilmington. The apartment consisted of living room, kitchen and shed on the ground floor, and two bedrooms and a bath on the second floor. On the evening of February 19, 1953, Helen, her sister Betty, aged fifteen, and a friend of Betty's, Beverly Bryson, aged seventeen, watched a television program in the living room until about eleven o'clock. The father, employed on a night shift, left the apartment shortly before eleven to go to work.

At about eleven o'clock Betty and her friend went upstairs to bed in the bedroom over the kitchen. They had been up late the night before—"till morning"—and were tired. Helen undressed and went to bed on the living room sofa. She was wearing a pajama top and a pair of pants. The only bed linen was a chenille bedspread, under which she slept.

Some time in the early morning (probably around two o'clock), Wilson entered the apartment, probably through the unlocked kitchen door, awoke the girl, and announced his intention to have sexual intercourse with her. She screamed, cried, and resisted fiercely. Wilson stifled her cries by holding his hand over her mouth and nose and by choking her, and finally by

wrapping the bedspread around her head. In the struggle she was thrown to the floor, and was overpowered and ravished. When the act was over and she was free from her assailant, she got to her feet and turned on the light in the living room, and had a look at him. Wilson picked up his hat and went into the kitchen. She followed, turned on the kitchen light, and had another look at him as he turned around before going out the back door.

Crying and moaning, she went upstairs to the bathroom. The other two girls were awakened by her cries and went into the bathroom. Betty asked her what had happened. Helen replied that a colored man had got into the house and had raped her. The police were notified (2:26 a.m.) and almost immediately arrived at the apartment. Helen was sent to the Delaware Hospital, where she was examined and treated by the Police Surgeon.

The testimony of the other two girls, of the police officers who saw her upon their arrival, and of the examining physician, as well as her own testimony, established beyond any doubt that she had been subjected to brutal violence and to a sexual assault. There were lacerations, bruises and dried bloodstains on her face, bite marks on one of her breasts, bite marks on her right arm, and some bleeding around the vaginal area caused by external irritation. Examination of a smear from the vaginal canal showed evidence of recent intercourse.

The police on arriving at the apartment found the living room in disorder. The bedspread that had been used to stifle Helen's cries was on the floor, as well as two pieces of her torn pants. All were subjected to analysis and all were shown to be bloodstained. The pajama top that she had worn was also bloodstained.

Wilson was taken into custody at noon of the same day (February 20th). The trousers and shorts that he was wearing were taken from him and examined and were shown to be bloodstained. Semen was found in the fly area of the shorts. A tan

shirt and a topcoat, both bloodstained, were found in his room. Three buttons were missing from the shirt. Three buttons were found by the police on the floor of the living room where Helen had been attacked. The threads attached to them were compared under miscroscopic examination with the threads adhering to the shirt, and were found to correspond.

During the afternoon of February 20th Helen was taken to the police station. From an adjoining room she listened to the voices of three Negroes: Wilson, Detective Park and Detective Purnell. She identified Wilson's voice as that of her assailant. Shortly thereafter she unhesitatingly identified him in a police line-up with other Negroes. She positively identified him at the trial.

As before stated, the foregoing testimony was not contradicted by any witness. Wilson did not testify before the jury. A man with whom he shared his room testified that Wilson returned to the room "something like" two or two-thirty in the morning. The witness noticed that "the buttons was off his shirt" and asked him about it, but Wilson did not tell him anything. Wilson's mother testified that he was twenty-six years old, went to the fifth grade in school in West Virginia, and left school at the age of fourteen to go to work. Asked whether he had any illness or accident during boyhood, she replied: "It was his head". Asked what happened, she replied that he was in a car wreck and in a hospital as a result. No claim of mental illness at the time of the crime was made at the trial or is made now.

Wilson's principal contention here is that the court below committed prejudicial error in admitting into evidence a statement made by Wilson, reduced to writing, and signed by him in the presence of four detectives of the Wilmington Police Department.

I. The admissibility in evidence of Wilson's statement.

The substance of Wilson's written statement is that he left a beer garden about 11:30 or 12:00 o'clock on the night of the

19th; that he stood on the corner of Fourth and Walnut Streets about five minutes; that a white girl passed him and he accosted her and made a bargain to pay her five dollars for sexual intercourse; that they went to her house through the kitchen and into her bedroom, where they had intercourse; that she asked him for the money and he told her he didn't have it; that she then grabbed him and pulled the buttons off his shirt and he jerked away from her and ran out of the house. Later, he said, he returned to his room, where his roommate asked him what was wrong with his shirt, to which he replied (in effect) that he had been with a white girl and that she had torn the buttons off because he didn't have the five dollars to give to her.

When the Attorney General first sought to interrogate one of the detectives respecting the circumstances under which this statement was taken, Wilson's attorney asked leave to examine the witness on *voir dire,* and to do so in the absence of the jury, in order that the court might pass upon the admissibility of the statement. These requests were granted. Six police officers and an officer of the State Highway gave evidence on the issue, and Wilson was called on his own behalf. Upon the close of the hearing on *voir dire,* Wilson objected to the introduction of the statement on the ground that the evidence showed that it was obtained by coercion, after thirteen hours of questioning by police officers. After argument of counsel and consideration of authorities cited to it, the court overruled the objection and admitted the statemen in evidence. This is the ruling that is first assigned as error.

Wilson's contention is that the statement, though not a confession of guilt, was an incriminating admission, because it acknowledged his presence at the scene of the crime and admitted one essential element thereof—sexual intercourse with Helen Baker. The receipt into evidence of such admissions, says defendant, must be attended by the same safeguards that surround the use of confessions of guilt; and the State must affirmatively show that the statement was voluntary. Wilson further contends that the uncontradicted evidence shows that the statement was

obtained after many hours of questioning, while defendant was in the custody of the police; that the circumstances surrounding its making were inherently coercive; and that the trial court should have excluded it.

Before considering the legal questions suggested by these contentions, we examine the facts.

Wilson was taken into custody by Detectives Park and Purnell about noon on Friday, February 20th. (Wilson fixed the time as eleven o'clock, but Purnell testified positively, from a contemporary memorandum which he produced at the trial, that it was twelve o'clock noon.) Wilson was taken to the police station and asked to give an account of his whereabouts during the preceding night. He asked why he was being picked up and was told that a crime had been committed. The officers did not tell him the nature of the crime nor did they at that time charge him with any crime. He stated to the officers that he had spent the evening with some friends, and had twice visited a taproom at Fifth and Walnut Streets. (The taproom is distant two city blocks from the Baker home.) Shortly before midnight he left and walked to his home (it is about six blocks away), stood outside talking to a man a few minutes, and then went in and went to bed and stayed there the rest of the night.

After this statement was made, the officers asked him if they could look at his room and he assented. Park, Purnell and Wilson then went to Wilson's room where they found the shirt and topcoat above mentioned. After leaving Wilson's room the three of them went to a dry cleaning establishment, apparently to get a suit belonging to Wilson. They then returned to the Police Station.

Sometime thereafter, about 1:15 p.m., Inspector of Detectives Rich saw Wilson and directed that Helen Baker be brought to his office. Then occurred the identification of Wilson's voice in an adjoining room and the identification in the line-up, as before stated. Thereafter Wilson was questioned by police officers until about 7:30, when he was taken to the Delaware State

Police Station at State Road (about seven miles away) and given a lie-detector test by an officer of the Delaware State Police. During the ride to and from State Road one of Wilson's hands was handcuffed to the front seat of the car. How long a time was required for the road trip and the test does not definitely appear. Wilson said it was two hours. Certainly it could not have been much less than an hour, and was probably more.

On returning to the Police Station, he was again questioned by the police. It sufficiently appears that he denied any participation in the events of the preceding night above detailed. At no time prior to 11:30 p.m. did he mention being in the Baker home or admit having seen Helen Baker or anyone answering her description.

At 11:30 p.m. Wilson was in Inspector Rich's room with five officers. Wilson was confronted with Helen Baker. She was asked whether she had seen defendant before. She said emphatically that he was the man who had committed the offense. Helen Baker and three of the officers then left the room. Lieutenant Miller and Detective Hesser remained with Wilson. Miller testified as follows: He told Wilson that the girl had accused him of the crime and that he would be so charged; he informed Wilson that Wilson did not have to make any statement; he said that it was a serious crime; that they would listen to Wilson if Wilson wished to make a statement at that time. According to Miller's testimony Wilson then said: "I did not rape that girl; she did see me before", and then went on to tell them briefly what was later detailed in the written statement. Thereupon Inspector Rich returned to the room; questions were asked and answered and taken down in longhand. Thereafter, the statement was transcribed on the typewriter and finally signed and witnessed at about 1:35 a.m. According to Miller and Purnell, Wilson on leaving Rich's office saw Purnell across the room and said to him: "Mr. Purnell I have told them the truth."

While Wilson was held in the police station he had no contact with any one from outside. There is no evidence that he asked to see any friend or relative.

To support his objection that the statement was obtained from him by coercion, Wilson took the stand on the *voir dire* examination, in the absence of the jury. In substance he testified that when he signed the statement, he did not know what he was doing; that he was out of his head; he was hungry and was tired from questioning; that five or six officers had been questioning him; that the officers had refused him food, except for one stale sandwich, which he could not eat; that on one occasion he was yanked out of his chair and that he was pushed around. He testified that at one time he asked for an attorney, and was told that where he was going he didn't need an attorney. He also testified that when he took the lie-detector test he was fastened to the chair and could not move his arms; that he was scared; and that the machine made him "feel funny".

All of these statements were denied by the police officers, except that Park testified that at one time, not specified, Wilson rested his head on the desk and seemed to sleep for a few minutes, and that he was not interfered with. Park testified that he was offered food shortly after he was brought to the police station but refused it and took coffee. Purnell says the coffee was brought at three o'clock and that Wilson at that time said he was not hungry. Rich testified that at a time shortly after the line-up Wilson was asked if he wanted something to eat and he refused. Park testified that shortly after six o'clock he again asked Wilson if he wanted food. On Wilson's affirmative reply, sandwiches and coffee were brought to him. Again, about 11:00 or 11:30 p.m., hamburgers, coffee and doughnuts were brought in and Wilson was given all he wanted.

The officers denied that Wilson was "pushed around" or threatened or mishandled at any time; and denied that he seemed sick or "out of his head". Lieutenant Seitz of the State Police, who gave the lie-detector test, testified that the tube and other attachments connecting Wilson with the machine did not interfere with his power to move his arms; that Wilson did not seem scared; that the machine gives no sensation to the person taking the test; and that Wilson was "cooperative", i.e., an-

swered questions readily. Except for Wilson's unsupported statement that he was "pushed around" (elicited not on direct examination, but on cross), there is no evidence of physical abuse or violence.

Wilson's statement that he asked for an attorney was contradicted by the officers in whose presence the request was said to have been made.

It is suggested that Wilson's meagre education and retarded background was a circumstance bearing upon the voluntary nature of the confession. This may well be so, but the trial court saw and heard the witness and was able to determine what weight should be given to it in connection with the other evidence.

Wilson also testified on direct examination that he told the officers the truth, but they did not write down the truth. When he was asked what was untrue about the statement, his counsel objected, and a majority of the court ruled that he could not be interrogated about the contents of the statement, even to test his credibility. With this ruling we do not agree, but it reflects the court's solicitude to protect his right against self-crimination.

All of the foregoing evidence relating to the charge of coercion was heard by the court on *voir dire* examination, excepting Lieutenant Miller's testimony as to the confrontation at 11:30 p.m., notification to Wilson that he would be charged with the crime, and Wilson's preliminary oral statement made prior to the formal questioning taken down in writing. This latter testimony was given later, after the motion to exclude the statement had been denied, and was given in the presence of the jury.

It is now in order to consider defendant's contention that his statement to the officers was incriminating, and that its admission into evidence was subject to the rules that apply to confessions of guilt. The facts detailed above supply the answer

to this contention. Assuming (without deciding) that it is sound, we observe that the procedure followed in the court below conformed in all respects to the practice in Delaware respecting confessions. When a confession is offered, it is the practice for the State to go forward with evidence to show that it was voluntarily made.[1] The defendant has the right of *voir dire* examination in the absence of the jury,[2] and may offer testimony touching the issue of voluntariness. The trial court then rules upon its admissibility. It must determine whether there is a reasonable probability that the statement was obtained by the use of improper methods. *Cf. State v. Donovan,* 1 *Terry* 257, 8 *A.* 2d 876. If it determines the confession to be admissible, the defendant still has the right, if the testimony is conflicting, to have the issue of voluntariness submitted to the jury; and always has the right to have the jury pass upon the weight to be given to the confession.[3] If the confession is admitted, the State again presents evidence before the jury on the issue, and the defendant has again the right to do so, and the right to appropriate instructions from the court upon the issue when the case goes to the jury.

In this case the defendant sought and received the privilege of *voir dire* examination, and after the court had ruled that the statement was admissible the presiding judge explicitly advised Wilson's counsel of his right to call witnesses before the jury upon the issue. The State then adduced evidence before the jury

[1]Whether the State has the burden of proof in establishing the voluntary character of a confession seems not to have been clearly decided in this State. *Cf. III Wigmore, Evidence,* § 860. Our practice is as above stated.

[2]This practice is of recent origin. See *State v. Donovan,* 1939, 1 *Terry* 257, 8 *A.* 2d 876. Formerly the jury was not excluded. See *State v. Trusty,* 1898, 1 *Penn.* 319, 40 *A.* 766; *State v. Brinte and Jiner,* 1904, 4 *Penn.* 551, 58 *A.* 258; *State v. Brown,* 1911, 2 *Boyce* 405, 80 *A.* 146.

[3]Whether the admissibility of a confession is left to the jury to determine, or merely its weight and credit, is a point not heretofore clearly settled by our cases. *Cf. State v. Brinte and Jiner,* 4 *Penn.* 551, 564-565, 58 *A.* 258; and *State v. Powell,* 5 *Penn.* 24, 40-41; 61 *A.* 966. The charge in the *Brinte* case seems to be the correct one, and the recent tendency to abbreviate the charges on confessions appears to us to be unfortunate.

tending to show that the statement was voluntary. Wilson elected not to avail himself of his right to testify or call witnesses, and the officers' testimony before the jury stood uncontradicted. Thus, the voluntary nature of the statement was not really in issue when the case went to the jury.

In these circumstances we think it unnecessary to decide whether the statement contained an incriminating admission[4] or whether it was merely exculpatory and admissible without preliminary proof of voluntariness for the purpose of contradicting Wilson's previous denials and showing consciousness of guilt.[5] It is likewise unnecessary to decide whether the "confession rules" are applicable to incriminating admissions. *Cf. State v. Tilghman*, 6 *Penn.* 54, 60; 63 *A.* 772. The fact is that the admission of Wilson's statement into evidence was attended by as many of the safeguards surrounding the use of confessions as he chose to invoke.

With respect to the court's ruling, it appears that the claim of ill-treatment, the claim that counsel was requested, and the circumstances of Wilson's education and background presented factual issues, and, so far as we can judge from the record, there was no reasonable probability that the statement was wrongfully obtained. We see no reason to disagree with the decision of the trial court upon these matters.

Wilson's contention comes to this; that the uncontradicted facts show that the circumstances surrounding the making of the statement were inherently coercive.

Upon this question the principal fact to be considered is the length of time during which he was questioned. It is true, as his counsel says, that the questioning began at some time after

[4]*Cf. Ashcraft v. State of Tennessee*, 322 *U. S.* 143, 64 *S. Ct.* 921, 88 *L. Ed.* 1192; *Journal of Criminal Law and Criminology, Vol* 39, p. 743.

[5]See *III Wigmore, Evidence*, § 821; *Stein v. People of State of New York*, 346 *U. S.* 156, 73 *S. Ct.* 1077, 97 *L. Ed.* 1522; *People v. Okopske*, 321 *Ill.* 32, 151 *N. E.* 507; *People v. Trawick*, 78 *Cal. App.* 2d 604, 178 *P.* 2d 45.

twelve o'clock noon, and culminated in a statement signed at 1:35 a.m. But that period of time (about thirteen and one half hours) was not one of continuous questioning. It was intermittent. The longest continuous period appears to have begun at about 1:30 p.m. and ended at 7:30 p.m., when Wilson was taken to State Road. Another period of from two to three hours preceded the oral statement that he made to Lieutenant Miller at about 11:30 p.m. The remainder of the time was devoted to questioning based on the oral statement. A number of officers—five or six—took part in the questioning, apparently in relays.

Now, the questioning of a suspect held in custody is a practice well recognized and approved, as a valuable means of ascertaining the truth about a crime. *III Wigmore, Evidence,* § 851; *Stein v. People of State of New York,* 346 *U. S.* 156, 73 *S. Ct.* 1077, 1092, 97 *L. Ed.* 1522; *Lyons v. State of Oklahoma,* 322 *U. S.* 596, 64 *S. Ct.* 1208, 88 *L. Ed.* 1481; *Lisenba v. People of State of California,* 314 *U. S.* 219, 62 *S. Ct.* 280, 86 *L. Ed.* 166. Necessarily there are limits to such questioning. See *Turner v. Commonwealth of Pennsylvania,* 338 *U. S.* 62, 69 *S. Ct.* 1352, 93 *L. Ed.* 1810; *Malinski v. People of State of New York,* 324 *U. S.* 401, 65 *S. Ct.* 781, 89 *L. Ed.* 1029; *Haley v. State of Ohio,* 322 *U. S.* 596, 68 *S. Ct.* 302, 92 *L. Ed* 224. "The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Stein v. People of State of New York, supra* [346 *U. S.* 156, 73 *S. Ct.* 1093]. Each case must turn on its own facts, and it serves little purpose to review in detail the many decisions cited to us, especially since they are not entirely harmonious. The question is always whether the court can say, as a matter of law, that the confession was the result of unfair and oppressive tactics.

Now, the facts of the instant case rebut the suggestion that the questioning of Wilson coerced him into making his statement. In the first place, he never confessed his guilt. The statement was (at the most) an admission of his presence at the scene of the crime and of his intercourse with Helen Baker. If, to obtain a confession, the police had so browbeaten him that he

was at their mercy and willing to sign anything to stop his interrogation, why did they not produce an actual confession? In the second place, the statement does not appear to have been obtained as a direct result of the questioning. It followed the confrontation of Wilson and the girl, her accusation, and Lieutenant Miller's advice that Wilson would be charged with the crime, all of which took place after the questioning had been terminated. He then for the first time admitted that he had been with the girl, and attempted to exculpate himself by asserting that she had consented to his advances. The picture that emerges is not that of an ill-used man forced to incriminate himself. It is that of a man who decided that further denial of his association with the girl was hopeless, and that his best chance of escape from the law was to admit the association and claim consent. At all events, it is certainly an inference that a trial court or a jury could reasonably draw from the sequence of events.

In the light of these circumstances the statement was clearly admissible, and its weight was for the jury. Notwithstanding that Wilson asked for no instructions with respect to it, the trial court charged that the statements made to the police by Wilson, "if voluntarily and deliberately made, without any duress or coercion and free from promises or threats by others, should be considered by [the jury] together with all of the other evidence in the case." This charge was given in spite of the fact that Wilson chose not to make an issue of the statement before the jury. In view of his decision not to do so, the instruction was certainly sufficient. No specific exception was taken to it, as required by Rule 30 of the Rules of Criminal Procedure, *Del. C. Ann.*; and it may be inferred that the question of the admissibility of the statement did not at the trial assume the importance now sought to be given to it.

There is a further circumstance to be considered. Wilson was arraigned in the Muncipal Court of the City of Wilmington on the morning of Saturday, February 21st. and was committed for trial. According to Lieutenant Miller, whose testimony on this point is uncontradicted, the following occurred: At four

o'clock in the afternoon of the same day Wilson was again confronted with Helen Baker, in the presence of Miller and another officer, and the statement that he had signed was read to them. Thereupon Wilson was asked if it was true and he said that it was. Helen Baker, asked whether it was true, replied emphatically that it was not—that none of it was true. She then left the room; the officers told Wilson that they believed the girl; that they had reason to believe that she was not on any street corner. Wilson then said that he wished to make another statement—that the prior statement was not true.

The substance of this second statement was this: Wilson did not meet the girl on the street; he was walking by the house, looked in the window and saw her lying on a sofa, went into the house by a back door, and engaged her in conversation. They struck a bargain and she consented to the intercourse. He had no money to pay her and a tussle followed.

While this statement was being typed, Wilson changed it again. He said that there was no talk of money; that the girl had asked him to perform an unnatural act that he did not want to do and that he fought to get out.

Neither of these statements was reduced to writing and signed.

The foregoing testimony was given before the jury without objection. It is said that failure to object to the admission of the later statements constituted no waiver of the objection made to the first statement. Even so, there is no basis for any claim that the later statements were obtained by coercion. They were made fourteen hours after the signing of the first statement. They did not form part of one continuous process, as was the case in *Leyra v. Demno*, 347 *U. S.* 556, 74 *S. Ct.* 716. They strongly tend to confirm the testimony of the police that the first statement was voluntary.

It is said that Wilson was held incommunicado until the statement was obtained, and also that he was not sufficiently advised of his constitutional rights to remain silent. The ques-

tioning of one under arrest, though in seclusion, is not in itself illegal and does not necessarily invalidate a confession. *Cf. III Wigmore, Evidence,* § 851. And the testimony is uncontradicted that immediately after Wilson was charged he was advised of his right to remain silent. This was not an empty form; the caution was given before Wilson had made any statement about the matter other than a denial.

Wilson builds an argument upon the Uniform Arrest Act, 11 *Del. C. Ann.* § 1901 *et seq.,* adopted in Delaware in 1951. The statute is set out in the footnote.[6] The argument is twofold. The first aspect of it is based upon testimony of one of the officers who took Wilson into custody. He said on cross-examination that while Wilson was in the police station he was in custody but not under arrest. Proceeding upon the premise that he was not arrested when taken into custody, Wilson argues that under the statute his detention after two hours was unlawful, and that the statement was inadmissible because obtained during an unlawful detention; citing *Rickards v. State,* 6 *Terry* 573, 77 *A.* 2d 199. The alternative argument is that if Wilson was arrested on Friday morning, he was not informed of the nature of the charge against him and promptly arraigned, and for that reason his detention was unlawful and the statement made during the period of detention should be excluded.

[6] "§1901. Definitions—as used in this subchapter—

" 'Arrest' is the taking of a person into custody in order that he may be forthcoming to answer for the commission of a crime;

" 'Peace officer' is any public officer authorized by law to make arrests in a criminal case."

"§1902. Questioning and detaining suspects

"(a) A peace officer may stop any person abroad who he has reasonable ground to suspect is committing, has committed, or is about to commit a crime, and may demand of him his name, address, business abroad, and where he is going.

"(b) Any person so questioned who fails to identify himself or explain his actions to the satisfaction of the officer may be detained and further questioned and investigated.

"(c) The total period of detention provided for by this section shall not exceed two hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be arrested and charged with a crime."

Now, this contention (the applicability of the arrest statute) was never made at the trial. It was suggested for the first time on a motion for a new trial after conviction. Consequently the record is not so clear as it might have been if the contention had been seasonably made. Enough appears, however, to make it reasonably clear that Wilson was arrested. The record is full of instances of the characterization of the officers' action as an "arrest", by the presiding judge, the prosecuting officers, and defendant's counsel. Detective Purnell so characterized his action. Thus it was assumed at the trial by all concerned that an arrest had been effected on Friday morning. No suggestion to the contrary was made. Nor can it be doubted that the arrest was legal, that is, upon reasonable suspicion of felony. The *Rickards* case, involving a misdemeanor, is not in point.

The case is therefore one that falls within § 1901 of the arrest act, and not within § 1902. The testimony is reasonably clear that the officers did not stop Wilson to demand "his name, address, business abroad, and where he [was] going." The inference from the evidence is that they did not question him at all on the street; they took him at once to the police station. At all events, that is certainly a possible inference; any lack of certainty in the testimony is directly attributable to the failure to raise at the trial the questions we are now discussing.

The contention that the police failed to charge the defendant promptly after arrest simply raises in another form the question already considered—the legality of the questioning of a person in custody. That he was under arrest does not in itself operate to exclude the confession. *State v. Trusty, supra; State v. Brinte and Jiner, supra.* Nor does the delay in placing a formal charge necessarily exclude it. It is a circumstance that the court and the jury should consider in determining whether the confession was voluntary. If the point had been made at the trial, the court would have considered it and, upon request, could have instructed the jury to consider it. As above stated, it was not raised until after verdict.

We have examined all of the objections made to the admissibility of Wilson's written statement, as well as the oral statements made later. In so doing we have assumed that the statements contained an incriminating admission and that the rules governing confessions govern the admissibility of such admissions. Both these assumptions are open to doubt, but an analysis of the applicable legal principles is unnecessary. We are satisfied that no error was committed in admitting the statements.

## II. The charge of the court to the jury.

Wilson requested the court to charge the jury as follows:

"1. Upon proof of carnal penetration of a female of the age of consent, that is, of seven years of age or more in this State— the burden is upon the prosecution to further prove to the satisfaction of the jury beyond a reasonable doubt, that the penetration was consummated by force and against her will, only [or by] putting her in great fear and terror, before a conviction of rape can be had.

"A rape can only be committed against the will of the female and by force, or by putting her in great fear and terror; and if sexual connection is obtained by milder means, or in any other way with the consent or silent submission of the party, it cannot constitute the crime of rape in contemplation of law. When the fact appears that sexual connection has been had against the consent of the woman, the law implies force.

"Force is an essential element in the crime of rape, and must be proved beyond a reasonable doubt, to warrant conviction. *State v. Colombo,* 1 *Boyce* 96, 75 *A.* 616."

The court charged as follows:

\* \* \* \* \* \*

"Rape has been repeatedly defined by this court as the carnal knowledge of a woman by force and against her will. In language which is more generally understood, rape is sexual intercourse accomplished by force and against the will of the

woman. Force, either actual, or force which may be presumed by putting a woman in great fear, is, in legal contemplation, an essential element of the crime of rape."

\* \* \* \* \* \*

"The burden is upon the State to prove to your satisfaction beyond a reasonable doubt that the defendant did, in fact, have carnal connection with Helen Baker, and that it was against her will, either by force or by putting her in great fear.

"When the facts clearly show that sexual intercourse was had against the consent of the woman, the law implies force. The jury must be satisfied by the evidence, beyond a reasonable doubt, that the carnal connection was accomplished against the will of the female, that is, without her consent. Consent to the act given at the time prior to the penetration deprives the subsequent act of its carnal connection no matter how reluctantly it may have been given. But it must be kept in mind always that the submission to overpowering force as a result of having been put in great fear is not consent. Submission to force is one thing; consent is quite another thing."

Wilson argues that the failure to charge on "silent submission" was error. Such a charge, he says, was demanded by the facts of the case, which showed that neither of the girls on the second floor heard any outcry at the time of the assault.

Wilson cites, among other cases, *State v. Colombo*, 1 *Boyce* 96, 75 *A.* 616, 618, in which the court charged the jury as follows:

"A rape can only be committed against the will of the female and by force, or by putting her in great fear and terror; and if sexual connection is obtained by milder means, or in any other way with the consent or silent submission of the party, it cannot constitute the crime of rape in contemplation of law. When the fact appears that sexual connection has been had against the consent of the woman, the law implies force."

 The charge in the *Colombo* case would seem to imply that silent submission in itself is proof that the act was not against the will of the female. But this is not so; silent submission may flow from fear. The court below so charged and we think correctly. See *State v. Dill*, 3 *Terry* 533, 537, 40 *A.* 2d 443. Of course the absence of outcries is highly pertinent on the issue of resistance, but the question is always whether the act was accomplished by force or putting in fear and against the will of the female. Her silence is an evidentiary fact, to be considered by the jury along with the other evidence.

In the instant case the court twice correctly defined the crime to the jury, as intercourse accomplished by force or by putting in great fear, and charged that the State must prove beyond a reasonable doubt that the defendant had connection with Helen Baker and that it was had against her will, either by force or by putting her in great fear.

Wilson attempts to support this contention by a supposed distinction between an act committed "against the will of the female" and an act committed "without her consent". It is not enough, he says, to show non-consent; it must be shown that the act was "against her will"; citing *Sigerella v. State*, 1 *Boyce* 157, 74 *A.* 1081, 1082; 2 *Bishop, Criminal Law*, § 1114. It is true that this case appears to recognize the distinction, but its language must be read in the light of the question before the court. It was there contended that the statutory enactment punishing one who has intercourse with a female under the age of eighteen had impliedly repealed the statute punishing rape of females under the statutory age of consent. In effect the court held that statutory non-consent is not the equivalent of the use of force against the will of the female.

 We do not question the soundness of this decision, but it is not in point here. In the case of a female over the age of consent, the phrases "against the will of the female" and "without her consent" mean the same thing. Any attempted distinction would be meaningless and could only confuse a jury if

it were attempted. In *Commonwealth v. Burke*, 105 *Mass*. 376, 7 *A. Rep.* 531, Justice Gray said:

"All the statutes of England and of Massachusetts, and all the textbooks of authority, which have undertaken to define the crime of rape, have defined it as the having carnal knowledge of a woman by force and against her will. The crime consists in the enforcement of a woman without her consent. The simple question, expressed in the briefest form, is, was the woman willing or unwilling? The earlier and more weighty authorities show that the words "against her will", in the standard definitions, mean exactly the same thing as "without her consent"; and that the distinction between these phrases, as applied to this crime, which has been suggested in some modern books, is unfounded."

See also 1 *Wharton, Criminal Law,* § 700.

In the later Delaware case of *State v. Dill, supra,* the two phrases are correctly treated as synonymous.

We find no error in the charge as given.

Wilson makes a final objection to the court's refusal to give the following charge:

"In view of the fact, as has long before been remarked by courts in this State and elsewhere, that rape is an accusation easily to be made and hard to be proved, and harder to be disproved by the accused, though ever so innocent, the jury must be satisfied that every essential element in the crime has been proved beyond a reasonable doubt. *State v. Burton,* 1 *Houst. Cr. Code* [*Cas.*] 363".

This charge is often called "the caution of Lord Hale." See *Hale's Pleas of the Crown,* Vol. 1, p. 634. It embodies a .wise precept, and there are many cases in which it is not only appropriate but required. For example, if the woman's testimony is not corroborated and the evidence is conflicting, *People v. Rankens,* 66 *Cal. App.* 2d 956, 153 *P.* 2d 399, or if the circum-

stances suggest doubt of the truth of her story, *Connors v. State,* 47 *Wis.* 523, 2 *N. W.* 1143, it is held to be reversible error to refuse the charge.

But it would have been inappropriate here. The identity of the assailment was not in question. Violence to the person of Helen Baker was conclusively shown. Complaint was made immediately. No testimony called by the defense even tended to rebut the State's case. What purpose would have been served by giving a caution that the court and the jury might be imposed upon by a baseless accusation, except to cast an unwarranted doubt upon uncontradicted evidence?

We think that there was no error in refusing the requested charge in this case.

This is a capital case. We have thought it our duty to examine the record with great care, and as far as possible to disregard procedural questions in order to reach the merits. Our effort has been to determine whether in Wilson's trial there was, in addition to any error of law, any departure from "that fundamental fairness essential to the very concept of justice".[7] We have found none and the conviction and sentence must stand.

The judgment of the Superior Court is affirmed.

[7]Mr. Justice Roberts, in *Lisenba v. People of State of California, supra* [314 *U. S.* 219, 62 *S. Ct.* 290].