ALLISON T. WILLIAMS, Appellant, v. STATE OF DELAWARE, Appellee.

(*December* 8, 1964)

WOLCOTT and CAREY, Justices and MARVEL, Vice Chancellor, sitting.

*David Snellenburg, II,* of Killoran & VanBrunt, for appellant.

*Thomas Herlihy, III,* Chief Deputy Atty. Gen., for the State.

Supreme Court of Delaware, No. 63 — 1962.

WOLCOTT, Justice.

This is an appeal from a conviction of burglary in the fourth degree committed at the "House of Diamonds" in Wilmington. The trial judge signed a certificate under 11 *Del. C.* Sec. 4502, and Williams was admitted to bail pending his appeal.

Williams was first tried in March, 1961 with two other defendants, one of them his brother, for the crime of which he now stands convicted. During the course of this first trial one of the other defendants successfully moved for a severance and the jury found the brother of Williams guilty, but disagreed as to Williams. Williams thereafter, in June, 1961, was tried alone and convicted by the jury. He now appeals from this conviction.

The evidence produced by the State was to the effect that Williams was arrested in New Jersey for the crime, ultimately waived extradition and was brought back to Delaware by automobile in the custody of two Wilmington detectives, arriving at police headquarters at about 7:30 P.M. of December 30, 1959.

In the course of the trip back to Wilmington Williams made several admissions to the detectives. He stated that he acted as lookout while the burglary was committed; that his role in the crime was a minor one; that he had been in Wilmington twice planning the crime, and that since he had not realized the owner of the "House of Diamonds" carried no insurance he would do everything he could to get the jewelry back.

Prior to entering Delaware and while still in New Jersey, one of the detectives suggested to Williams that while still in New Jersey it would be best to recover the diamonds if they were still in New Jersey because it would be difficult for him to leave Delaware once he had arrived there. Williams said he did not know what he could do and that he wanted to speak to a lawyer before committing himself to do anything.

Upon arrival at the Wilmington Police Station on December 30, 1959 Williams again said he wanted to speak to a lawyer. Several telephone calls were made, either by Williams or on his behalf, to Delaware lawyers to find out if they had been retained by Williams' New Jersey lawyer to represent him. Williams actually talked with three Delaware lawyers, one of whom represented the owner of the "House of Diamonds."

Thereafter, Williams made other admissions during the course of December 31, 1959 which, while not confessions, nevertheless implicated him in the crime. In the early evening of December 31, 1959 Williams received a telephone call from which he apparently learned he could recover at least part of the stolen jewelry. The result was that Williams was promised by the police that they would do what they could to get his bail reduced if he in turn helped to recover the jewelry.

As a result, Williams was released on his own recognizance and, in the company of three police officers, returned to New Jersey where they recovered a portion of the stolen jewelry. On January 1, 1960 the owner of the "House of Diamonds" posted a bond for Williams' reduced bail, and on January 4, 1960 Williams turned over to the Wilmington police some additional stolen jewelry.

The next event in this bizzare episode was a trip in Williams' car to Florida from January 7 to 17, 1960, made by Williams and Wilmington police officers to see Williams' brother who ultimately was convicted at the first trial. In the course of this trip Williams made other admissions to the officers implicating himself in the burglary.

All of the foregoing came out in testimony at Williams' second trial. The trial judge, when the promise to reduce bail was testified to, ruled that any admission made by Williams after such promise had been made was inadmissible in evidence because in law such an admission was induced by the promise and was therefore involuntary. After his ruling he instructed the jury to ignore testimony as to any admission made by Williams after the promise to get his bail reduced had been made by the police.

At his trial Williams' defense was alibi which he attempted to establish by a witness from Philadelphia who testified Williams was in his restaurant at or about the time the crime took place. Upon the conclusion of this witness' testimony the Deputy Attorney General prosecuting the case caused him to be arrested in the corridor outside the courtroom upon a charge of perjury. Since the trial went over to the following day, the morning newspaper of which carried an account of the arrest of the witness for perjury, Williams' counsel moved for a mistrial upon the ground that Williams' defense had been prejudiced in the minds of the jury. Upon inquiry by the trial judge of the members of the jury, it appeared that none had read the newspaper article in question. The motion for a mintrial was thereupon denied.

Upon the foregoing circumstances Williams urges upon us several reasons why his conviction should be reversed and he be given a new

trial. He first argues that even though later excluded from evidence, the testimony of numerous admissions made by him after the promise of bail reduction had a cumulative prejudicial effect so as to make his trial fundamentally unfair, thus depriving him of due process of law.

At the trial when the December 31, 1959 promise of the police to get Williams' bail reduced was testified to, the trial judge *sua sponte* ruled that any admission by Williams after that date as a matter of law must be presumed to have been induced by that promise and was therefore involuntary. He accordingly ordered such testimony struck from the record and instructed the jury that it could consider only testimony of admissions made by Williams prior to December 31 for the reason that anything subsequent to that date was made inadmissible in evidence by the promise of bail reduction. Later, during the summation by the prosecution and as a result of an objection by defense counsel, the trial judge again instructed the jury on the point.

The second instruction arose because Williams had testified that the promise of bail reduction had been made on December 30 rather than on December 31, which the police testified to be the fact. The jury was instructed that it must resolve this fact and disregard any statement or action of Williams after the date they believed the promise to have been made which tended to incriminate him. He then inquired of the members of the jury if his ruling was understood and when it was plain that it was, the trial continued.

It appears from Williams' brief and appendix and oral argument that his inadmissible admissions and actions after December 31, 1959 were as follows: On January 4, 1960, while out on bail he delivered to the police further items of the stolen jewelry; on January 7, 1960 he returned another diamond to the police; during the trip to Florida he discussed his participation in the burglary with the police; on January 20, 1960 he returned to the police an unset stone and wrist watch; on January 28, 1960 he told the police he would plead guilty, and on March 10, 1960 he showed the police a walkie-talkie radio used in the burglary, returned a watch and diamond ring, told the police the unreturned portion of the jewelry had been disposed of, and identified

the vantage point of himself as lookout.

We think the excluded testimony was at most cumulative as to voluntary admissions of Williams properly in evidence. This fact coupled with the careful instructions of the trial judge to the jury to ignore the inadmissible testimony, effectively, we think, removed any possibility of prejudice to Williams in his trial. The case is therefore entirely dissimilar to *Curran v. State of Delaware, D.C.*, 154 F. Supp. 27, if that case be sound law, where it appeared that there had been a deliberate concealment of fact upon a minor point by a police detective on the witness stand.

We accordingly are of the opinion that Williams was not prejudiced by reason of the police testimony as to admissions made after December 31, 1959 and later ordered struck from the record with appropriate instructions to the jury to ignore such testimony.

Next, Williams argues that the arrest of his alibi witness and the subsequent publicity of it deprived him of due process of law. We have outlined above the circumstances under which the witness was arrested and charged with perjury. On the following day counsel for Williams moved for a mistrial by reason of the arrest in the proximity of the courtroom and the news article concerning it which appeared in the Wilmington Morning News of that day.

In accordance with the practice of the Superior Court, the jury had been instructed not to read anything concerning Williams' trial which appeared in the newspapers while it was in progress. The trial judge, following the motion for a mistrial, inquired of the members of the jury whether or not any of them had read the article in question. One only admitted having seen it. She, however, read only that portion appearing on the front page and did not pursue it on the inside pages. The objected-to portion of the article was in fact carried on an inside page of the newspaper.

At the request of Williams' counsel the trial judge then inquired of the jury whether or not any of them were aware of an incident

taking place the day before near the courtroom which had some connection with the trial of Williams. The jurors answered in the negative.

We think no prejudice resulted since the jury knew nothing of the incident nor of the newspaper article. *People v. Malmenato,* 14 Ill. 2d 52, 150 N.E. 2d 806, c.d. 358 U.S. 899, 79 S. Ct. 222, 3 L. Ed. 2d 148. Under the circumstances we would not be justified in assuming that the members of the jury in violation of their oaths answered falsely to the judge, or withheld information from him. The presumption is that members of the jury are true to their oaths. *United States v. Sorcey,* 7.Cir., 151 F. 2d 899, c.d. 327 U.S. 794, 66 S. Ct. 821, 90 L. Ed. 1021. Furthermore, we think our decision in *Williams v. State,* Del., 205 A. 2d 9, in which a very similar question came up controls.

Next, Williams argues that he was denied due process of law because the trial judge submitted to the jury the issue of the voluntariness of his admissions contrary to the ruling of *Jackson v. Denno,* 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908. *Jackson v. Denno* held that a defendant is guaranteed a right, at some stage of the proceeding, to have a fair hearing and a reliable determination of the issue of voluntariness, uninfluenced by the truth or falsity of the confession, which was not satisfied by the New York rule that the trial judge must make a preliminary determination of this issue and shall exclude a confession from evidence only if under no circumstances could it be deemed voluntary. This was held to violate the constitutional right of the defendant.

*Jackson v. Denno,* however, approves the rule followed in Massachusetts as safeguarding the defendant's right. In Massachusetts the rule is that the trial judge initially, fully and independently resolves the issue of voluntariness against the defendant, and then ubmits it to the jury which may *still* determine the issue for itself despite the preliminary finding of the judge.

In Delaware the rule in such matters to be followed in the trial

courts is in substance the same as that followed in Massachusetts. We have so held in *Wilson v. State,* 10 Terry 37, 109 A. 2d 381. We think the trial judge complied with the rule. He permitted in the absence of the jury a *voir dire* examination on the issue of voluntariness, admitted the evidence, and finally instructed the jury that it could rely on the admissions only if it found them to have been made voluntarily. This, we think, satisfies the requirements of *Jackson v. Denno.*

█ Finally, Williams argues that he was denied due process of law by reason of the fact that he was denied counsel in violation of the rule of *Escobedo v. State of Illinois,* 378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977. We think, however, the facts before us do not remotely approach those of *Escobedo v. State of Illinois,* for the reason that Williams was not denied the opportunity to obtain counsel and, to the contrary, was assisted to this end by the police. If he was unable to do so at the time that fault was his and not that of the police. It is of some importance, it seems to us, that he did not ask the authorities to furnish him a lawyer, but merely that he be given the opportunity to obtain one. That he ultimately did so is the fact, for he was defended below and represented in this court by counsel of his retention.

For the foregoing reasons the conviction below is affirmed.