**Allison T. WILLIAMS, Petitioner,**

v.

**Raymond W. ANDERSON, Respondent.**

**No. 44.**

United States District Court
D. Delaware.

Sept. 1, 1965.

David Snellenburg, II, of Killoran & Van Brunt, Wilmington, Del., for petitioner.

Charles L. Paruszewski, Chief Deputy Atty. Gen. for State of Delaware, Wilmington, Del., for respondent.

LAYTON, District Judge.

Petitioner [1] was convicted of burglary in the fourth degree in the Delaware Superior Court, his conviction affirmed by the Delaware Supreme Court, and this petition for habeas corpus followed. The facts as found by the Supreme Court of Delaware, Williams v. State, 206 A.2d 501, seem fairly to reflect the record. They are as follows:

"Williams was first tried in March, 1961 with two other defendants, one of them his brother, for the crime of which he now stands convicted. During the course of this first trial one of the other defendants successfully moved for a severance and the jury found [Clifford] the brother of Williams guilty, but disagreed as to [Allison] Williams. [Allison] Williams thereafter, in June, 1961, was tried alone and convicted by the jury. He now appeals from this conviction.

1. Petitioner's brother, Clifford, was convicted in this same affair. His petition for habeas corpus was denied by this

Court on July 20, 1964 and September 22, 1964.

"The evidence produced by the State was to the effect that [Allison] Williams was arrested in New Jersey for the crime, ultimately waived extradition and was brought back to Delaware by automobile in the custody of two Wilmington detectives, arriving at police headquarters at about 7:30 P.M. of December 30, 1959.

"In the course of the trip back to Wilmington Williams made several admissions to the detectives. He stated that he acted as lookout while the burglary was committed; that his role in the crime was a minor one; that he had been in Wilmington twice planning the crime, and that since he had not realized the owner of the 'House of Diamonds' carried no insurance he would do everything he could to get the jewelry back.

"Prior to entering Delaware and while still in New Jersey, one of the detective suggested to Williams that while still in New Jersey it would be best to recover the diamonds if they were still in New Jersey because it would be difficult for him to leave Delaware once he had arrived there. Williams said he did not know what he could do and that he wanted to speak to a lawyer before committing himself to do anything.

"Upon arrival at the Wilmington Police Station on December 30, 1959 Williams again said he wanted to speak to a lawyer. Several telephone calls were made, either by Williams or on his behalf, to Delaware lawyers to find out if they had been retained by Williams' New Jersey lawyer[2] to represent him. Williams actually talked with three Delaware lawyers, one of whom represented the owner of the 'House of Diamonds.'

"Thereafter, Williams made other admissions during the course of December 31, 1959 which, while not confessions, nevertheless implicated him in the crime. In the early evening of December 31, 1959 Williams received a telephone call from which he apparently learned he could recover at least part of the stolen jewelry. The result was that Williams was promised by the police that they would do what they could to get his bail reduced if he in turn helped to recover the jewelry.

"As a result, Williams was released on his own recognizance and, in the company of three police officers, returned to New Jersey where they recovered a portion of the stolen jewelry. On January 1, 1960 the owner of the 'House of Diamonds' posted a bond for Williams' reduced bail, and on January 4, 1960 Williams turned over to the Wilmington police some additional stolen jewelry.

"The next event in this bizarre episode was a trip in Williams' car to Florida from January 7 to 17, 1960, made by Williams and Wilmington police officers to see Williams' brother [Allison] who ultimately was convicted at the first trial. In the course of this trip Williams made other admissions to the officers implicating himself in the burglary.

"All the foregoing came out in testimony at Williams' second trial. The trial judge, when the promise to reduce bail was testified to, ruled that any admission made by Williams after such promise had been made was inadmissible in evidence because in law such an admission was induced by the promise and was

---

2. It is conceded that prior to this time petitioner had retained as his lawyer one Malandra of Camden, N.J., to represent him in this case and had held a conference with him about it. However, Malandra felt that since petitioner was going to waive extradition and the case would be tried in Delaware, he should retain a Delaware lawyer, which he agreed to do for him.

therefore involuntary. After his ruling he instructed the jury to ignore testimony as to any admission made by Williams after the promise to get his bail reduced had been made by the police.

"At his trial Williams' defense was alibi which he attempted to establish by a witness from Philadelphia who testified Williams was in his restaurant at or about the time the crime took place. Upon the conclusion of this witness' testimony the Deputy Attorney General prosecuting the case caused him to be arrested in the corridor outside the courtroom upon a charge of perjury. Since the trial went over to the following day, the morning newspaper of which carried an account of the arrest of the witness for perjury, Williams' counsel moved for a mistrial upon the ground that Williams' defense had been prejudiced in the minds of the jury. Upon inquiry by the trial judge of the members of the jury, it appeared that none had read the newspaper article in question. The motion for a mistrial was thereupon denied."

■ First, Williams argues that the newspaper publicity incident to the arrest of the alibi witness infected the minds of the jurors to the extent of prejudicing his constitutional rights. In my opinion, the Supreme Court of Delaware correctly disposed of this contention in Williams v. State, 206 A.2d at p. 503 et seq., where it held:

"Next, Williams argues that the arrest of his alibi witness and the subsequent publicity of it deprived him of due process of law. We have outlined above the circumstances under which the witness was arrested and charged with perjury. On the following day counsel for Williams moved for a mistrial by reason of the arrest in the proximity of the courtroom and the news article concerning it which appeared in the Wilmington Morning News of that day.

"In accordance with the practice of the Superior Court, the jury had been instructed not to read anything concerning Williams' trial which appeared in the newspapers while it was in progress. The trial judge, following the motion for a mistrial, inquired of the members of the jury whether or not any of them had read the article in question. One only admitted having seen it. She, however, read only that portion appearing on the front page and did not pursue it on the inside pages. The objected-to portion of the article was in fact carried on an inside page of the newspaper.

"At the request of Williams' counsel the trial judge then inquired of the jury whether or not any of them were aware of an incident taking place the day before near the courtroom which had some connection with the trial of Williams. The jurors answered in the negative.

"We think no prejudice resulted since the jury knew nothing of the incident nor of the newspaper article. People v. Malmenato, 14 Ill. 2d 52, 150 N.E.2d 806, c. d. 358 U.S. 899, 79 S.Ct. 222, 3 L.Ed.2d 148. Under the circumstances we would not be justified in assuming that the members of the jury in violation of their oaths answered falsely to the judge, or withheld information from him. The presumption is that members of the jury are true to their oaths. United States v. Sorcey, 7 Cir., 151 F.2d 899, c. d. 327 U.S. 794, 66 S.Ct 821, 90 L.Ed. 1021. Furthermore, we think our decision in Williams v. State, Del., 205 A.2d 9, in which a very similar question came up controls."

■ Next it is contended that, although later excluded from the record, testimony as to a number of admissions made by him after the promise of bail reduction had such a cumulative prejudicial effect as to render his trial fundamentally unfair. The Supreme Court

of Delaware carefully considered this point at 206 A.2d 503, and said:

"At the trial when the December 31, 1959 promise of the police to get Williams' bail reduced was testified to, the trial judge *sua sponte* ruled that any admission by Williams after that date as a matter of law must be presumed to have been induced by that promise and was therefore involuntary. He accordingly ordered such testimony struck from the record *and instructed the jury that it could consider only testimony of admissions made by Williams prior to December 31 for the reason that anything subsequent to that date was made inadmissible in evidence by the promise of bail reduction. Later, during the summation by the prosecution and as a result of an objection by defense counsel, the trial judge again instructed the jury on the point.* (Emphasis added.)

"The second instruction arose because Williams had testified that the promise of bail reduction had been made on December 30 rather than on December 31, which the police testified to be the fact. The jury was instructed that it must resolve this fact and disregard any statement or action of Williams after the date they believed the promise to have been made which tended to incriminate him. *He then inquired of the members of the jury if his ruling was understood and when it was plain that it was, the trial continued.* (Emphasis added.)

"It appears from Williams' brief and appendix and oral argument that his inadmissible admissions and actions after December 31, 1959 were as follows: On January 4, 1960, while out on bail he delivered to the police further items of the stolen jewelry; on January 7, 1960 he returned another diamond to the police; during the trip to Florida he discussed his participation in the burglary with the police; on January 20, 1960 he returned to the police an unset stone and wrist watch; on January 28, 1960 he told the police he would plead guilty, and on March 10, 1960 he showed the police a walkie-talkie radio used in the burglary, returned a watch and diamond ring, told the police the unreturned portion of the jewelry had been disposed of, and identified the vantage point of himself as lookout.

"We think the excluded testimony was at most cumulative as to voluntary admissions of Williams properly in evidence. This fact coupled with the careful instructions of the trial judge to the jury to ignore the inadmissible testimony, effectively, we think, removed any possibility of prejudice to Williams in his trial. The case is therefore entirely dissimilar to Curran v. State of Delaware, D.C., 154 F.Supp. 27, if that case be sound law, where it appeared that there had been a deliberate concealment of fact upon a minor point by a police detective on the witness stand.

"We accordingly are of the opinion that Williams was not prejudiced by reason of the police testimony as to admissions made after December 31, 1959 and later ordered struck from the record with appropriate instructions to the jury to ignore such testimony."

I decline to interfere with the disposition of this point by the Delaware Supreme Court. It is idle to speculate what the result might have been had this been a Federal District Court conviction being reviewed by a Federal Circuit Court under its supervisory powers. It is not. I feel that on the facts before me, the petitioner's constitutional rights were not jeopardized to a degree which would justify the imposition of the more rigid standards of the Federal Courts in considering this point.

Petitioner's principal contention is that he was denied due process of law in that the admissions made to the two

detectives during the drive from New Jersey to Delaware and thereafter, up to the time of the promise to obtain a reduction of bail, were obtained in contravention of his constitutional rights. In this connection he relies on Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Russo v. United States, 3 Cir., 351 F.2d 429 both decided four or five years after the commission of this offense. I doubt if Escobedo has any application. This petitioner did not ask for a lawyer. He had already retained a Camden, N. J., attorney and consulted him and that lawyer had stated he would obtain Delaware counsel for him. Nor did the police deny him the services of a lawyer. To the contrary, they cooperated with him to a most unusual degree in attempting to obtain counsel. However, Russo may govern. I do not decide because it is my conclusion that, conceding arguendo that it does, petitioner, with a full knowledge of his rights, freely waived them in the course of making the admissions complained of.

At the outset, it is significant to note that " 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights * * *." Johnson v. Zerbst, 304 U.S. 458, at 464, 58 S.Ct. 1019, at 1023, 82 L.Ed. 1461 (1938). In that case, the Court said:

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Id. at 464, 58 S.Ct. at 1023.

Even so, for several reasons I regard the actions of the petitioner as constituting a waiver. In Russo, the Third Circuit Court among other things was obviously impressed by the fact that petitioner was "within the lower reaches of the average range of intelligence."[3] To the contrary, this petitioner seems to have been intelligent, shrewd, and was an educated man having attended college for three years and, in fact, was studying for the ministry.

■ An important element for consideration here is whether the accused was apprised of his rights. In both Escobedo and Russo, the court noted that the police had failed to advise the accused (1) of his privilege to remain silent, (2) that anything said might be used against him, and (3) that he had the right to counsel. Apparently, the police in this case did not give him these warnings. Clearly they should have. However, it is important to remember that he had retained a lawyer in New Jersey and that in both Escobedo and Russo, the courts took care to point out that one who has conferred with counsel presumably knows of his right to remain silent and that anything he says may be used against him.[4]

Of significance also is the statement by the court in Russo that "[t]he request * * * to consult with his attorney is in and of itself evidence that he [defendant] was aware of his constitutional rights." It will be remembered that just before entering Delaware, petitioner hesitated to answer further questions until he had consulted his attorney.

■ Not only this, but Williams' whole attitude throughout this unusual affair bespoke a man who wanted to tell the truth and see that restitution was

---

3. "[Russo] 'was markedly deficient with respect to his capacity for verbal abstraction, the capacity to think abstractly, and the capacity to evaluate reality with any validity, and with any substance, with any genuine understanding of what is going on around him * * * that his social judgment and perceptual alert-ness were massively impaired with respect to what the norm might be.' "

4. "[A]ny lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances." Jackson, J., in Watts v. State of Indiana, 338 U.S. 49, 59, 69 S.Ct. 1347, 1357, 1358, 93 L.Ed. 1801.

made. He talked freely on the way from New Jersey to Delaware, hesitated briefly, but having unsuccessfully called several lawyers with the aid of the police, then proceeded freely and volubly thereafter, including the whole round trip to Florida, to discuss his part in the affair. I think a review of the entire record indicates that there was a voluntary waiver within the legal definition of that term.

Petition denied.